## WESSELS v. CHICAGO GRANITINE MFG. CO.

Circuit Court of Appeals, Seventh Circuit. November 30, 1927.

Rehearing Denied February 28, 1928.

No. 3849.

**1. Patents ⟨key⟩312(3)—Evidence held to sustain defense of license.**

Evidence in patent infringement suit *held* sufficient to sustain defense of license interposed therein.

**2. Patents ⟨key⟩328—1,399,174, claims 4, 5, 6, for metal trim for top edges of laundry tubs, held invalid for lack of invention.**

Wessels patent, No. 1,399,174, claims 4, 5, and 6, for a metal trim for the top edges of laundry tubs, *held* invalid for lack of invention.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by Daniel D. Wessels against the Chicago Granitine Manufacturing Company. Decree for defendant, and plaintiff appeals. Affirmed.

Arthur H. Boettcher and Charles Brown, both of Chicago, Ill., for appellant.

Wm. E. Anderson, of Chicago, Ill., for appellee.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. Plaintiff (appellant) charged infringement of all the claims of Wessels patent, No. 1,399,174. The defenses were: (1) That as to the use prior to about June, 1924, there was a license; (2) noninfringement by the device used after that time; (3) invalidity. On each, the decree was for defendant (appellee), except that the validity of claims 1, 2, and 3 was not passed on.

The device of the patent is a metal trim for the top edges of laundry tubs, etc. Before the patent, the trim was formed by bending four pieces of galvanized iron, each the length of a side of the tub at its top, into a trough shape, with mitered ends, which, when soldered together, resembled, on the one side, a picture frame, and on the other, an endless trough, the sides of which were flanged inwardly. It is claimed those frames sometimes got bent and would not lie flat in the mold trench, and sometimes were too small, or for other reasons would bind upon the core of the mold, so that defective tubs occasionally resulted.

Patentee, to remedy those defects, used the old frame pieces, but neither mitered the ends nor soldered them together. Instead, he made a tongue on the ends of two of the pieces and slots in the sides, near the ends, of the other two pieces, so that, when the pieces were put together into a frame, with the tongue pieces inserted in the slots, the slots being larger than the width of the tongues, there was permitted a little sidewise play. The specification states the object to be: "To provide a metallic rim, the parts of which can be easily engaged with each other to interlock, and further can be adjusted relative to each other to properly fit within the mold."

So far as here material, laundry tubs are cast by pouring concrete into a trench, formed by a core, the size and shape of the inside of the tub, and a built-up shell, the inside of the shell being the measure of the outside of the tub walls, and its distance from the core being the thickness of those walls. Before concrete was poured into the mold, the old frame device was laid in the bottom of the trench, trough-side up, and the device of the patent, with the tongues of the side pieces inserted in the slots of the end pieces, is laid in the trench in the same way. When the concrete is poured, it fills the trough of the device, and the flanges on the side of the trough become imbedded in the hardened cement, so that the trim is incorporated in and becomes a part of the tub.

[1] We are of opinion that the defense of license to use the device of the patent is sustained by the direct evidence thereon, and that further support is given thereto by the testimony as to the relation of the parties. They were members, and some of them officers, of the Western Association of Concrete Laundry Tray Manufacturers, composed of men engaged in the manufacture and sale of laundry tubs, etc. The members of the association had factories at Chicago, Detroit, and elsewhere, and monthly meetings were held alternately in Chicago and Detroit, and they freely showed each other over the factories where they happened to be, and disclosed and explained improvements and new devices to each other. In this case, the business, association, and friendly relations of the parties have not been disturbed.

Early in 1924, defendant discontinued the use of plaintiff's device, and since has used the device of the Grogan patent, No. 1,537,-

600. It is admitted that that device does not infringe claims 1, 2, and 3, but it is urged that it does infringe claims 4, 5, and 6, which read as follows:

"4. In a molded receptacle, a metallic rim comprising members extending transversely of each other and provided with co-operating superposed interlocking portions, said members also having portions anchored in the material forming the molded receptacle whereby said members are held in rigid relation to each other.

"5. In a molded receptacle, a metallic rim comprising members extending transversely of each other and provided with co-operating interengaging portions for positioning the members at right angles to each other and for securing the members to each other while the receptacle is being molded, said members having anchoring portions molded within the material forming the receptacle whereby the members are held in rigid relation to each other.

"6. In a molded receptacle, a rim comprising transversely extending members provided with co-operating bearing portions arranged to initially permit of limited relative adjustment of said members, said members also having portions anchored in the material forming the molded receptacle whereby said members are solely held in rigid relation to each other."

The end and side pieces of defendant's device are substantially identical with those used in the old frame, above herein described, and with the members of plaintiff's device, except that there is no treatment of the ends at all; that is, they are neither mitered nor soldered together, nor are they formed with tongues or slots at the ends, but the side members are brought into co-operation, so as to form the frame, by the use of molded right-angled corner pieces, stamped from one piece of metal and having arms or extensions so shaped that the side pieces will telescope into them.

The urge is that those corner pieces are the "portions," as that word is used in the claims in question. The drawings of the patent show a frame of but two members, called 2 and 3. One of those members shows on each end a tongue, and the other member shows at each end a slot, and those, the spec-

ification says, are for the purpose of locking the two members at the corners when the frame is formed of two pieces each of the two members. Nowhere else is there mentioned any other member of the frame, except that in one place it is said: "The member 4 has the cut-away portion 14, forming the spaced bearing or tongues 15 and 16."

Clearly, this is an inadvertence, because the specification says "the member 2 has the top 4," and, in the drawings, the tongues are shown formed on and as a part of the end of the member 2. The specification further says "the tongue 15 is at the outer end of the top 4." It seems too clear for further discussion that the word "portion," as used in claims 4, 5 and 6, was intended to mean and does mean parts of the two members, and does not mean the wholly independent member, such as the corner pieces used by defendant.

[2] We do not regard defendant's device, with its corner pieces, as patentably the same as plaintiff's; but, if so, it could not avail plaintiff, because what plaintiff did does not amount to invention. The trench in which the frame is laid is old. The members used in a frame, with mitered and soldered joints, is old. The inventor simply changed the ends of the members to make them, as he says, interlock, and to provide for a small transverse movement of the members.

From the fact that the trim was to go into the bottom of the trench, which measured the thickness of the walls of the tub, over which the trim was to fit, there could be no possibility that the frame, once in place, could move anywhere. All the inventor did was to make use of the mortise and tenon, a thing which was old when the specifications were made for the Tabernacle in the Wilderness. Exodus, chap. xxvi, vs. 17, 18, 19. In Knight's Mechanical Dictionary, issued 50 years ago, there are shown a great variety of joints, made by the mortise and tenon. All built-up doors and all window sashes (and they are but frames) use the mortise and tenon. They are as old as the art of joinery. If there was any invention in the specific use adopted, it could not be stretched to cover all other uses of the mortise and tenon, or the just as common tongue and groove.

The decree is affirmed.